HENSON *v.* STATE

5124                    393 S. W. 2d 856

Opinion delivered September 27, 1965.

*Parker Parker,* for appellant.

*Bruce Bennett,* Atty. General, By: *Reg E. Wallin,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Phillip H. Henson, A/K/A Robert Victor Scheick, appellant herein, was charged by Information with the crime of rape, it being alleged that Henson forcibly, violently, and against her will, raped a young woman of the age of 20 years in Yell County on June 8, 1964. The case proceeded to trial on June 30, 1964, and at the conclusion of the evidence, the

jury found Henson guilty, and fixed his punishment at life imprisonment. From the judgment entered thereon, Henson brings this appeal. For reversal, appellant relies upon eight points, but inasmuch as we are of the opinion that the judgement must be reversed, a discussion of each alleged error becomes unnecessary.

Let it first be stated that there is ample evidence to sustain the jury finding. The prosecuting witness testified that she met Henson at a talent contest in Dover, and won first prize, which entitled her to sign a recording contract with Nimrod Records (a partnership with which he was connected). Subsequently, according to her testimony, Henson went to her home, and the two left together in an automobile, ostensibly for the purpose of Henson's introducing her to the other partners of the record concern. She testified that he later stopped on a side road, slapped and choked her, pinned her arms behind her, and then proceeded to rape her. The witness stated that he thereafter raped her a second time. Several witnesses verified the fact that her back was skinned and bruised, her neck and throat swollen, and that there were bruises also on her waist, legs and breasts. Dr. Douglas Lowrey of Russellville, who examined the prosecuting witness, testified that the hymenal ring had been torn within eight to twelve hours previous to his examination; that numerous spermatozoid were observed through a microscope in secretions inside the vagina. He likewise stated that she was bruised on both shoulders and the left thigh. The doctor was also of the opinion that she had been a virgin, stating,

"The hymenal ring had definitely been penetrated shortly before I saw this girl. There's no question about that. As to whether or not it had been penetrated before, I could not say absolutely and without any question. I would say, however, that from the appearance at that time, that it did not ever—it did not indicate that it had ever been pentrated before."

Henson admitted having intercourse with the prosecuting witness, but insisted that it was done with her

consent. This conflict of evidence, of course, was for the jury to determine. The evidence was definitely sufficient to support the jury's findings.

Appellant asserts that the court erred in not granting a motion for change of venue. It is sufficient to state that no proper showing was made that appellant could not obtain a fair trial in Yell county, and the trial court did not abuse its discretion in refusing to grant the motion.

It is also alleged that the court committed reversible error in permitting Dr. Walter Harris, of Danville, to testify. This alleged error is predicated on appellant's contention that Harris' testimony was based on privileged communications between the doctor and Henson. On June 14, 1964, a petition was filed on behalf of appellant, asking that he be committed to the State Hospital for a 30-day period of observation. The court then ordered that Henson be examined by two doctors, one of which was Dr. Harris. Subsequent to an examination made by Harris, the motion was withdrawn, but the examination had already been made. Dr. Harris testified that, from his examination, it was his opinion that Henson was a sexual psychopath, and the doctor then stated that "a sexual psychopath is an individual, neither insane nor mentally deficient, but in a state of mental apprehension that renders him unable to control the impluses in sex offenses." Dr. Harris testified, "A patient suffering from this disorder may obtain partners either willingly or by force, fraud or some other method, and I think that they could be dangerous." We do not agree with the contention that the admission of this testimony constituted error. In 58 AM. Jur., Section 418, Page 239, it is stated that privilege does not attach when a consultation with, or examination by, a physician is not for the purpose of treatment, but rather for some individual purpose known to the person examined.

"It follows that a physician who at the direction of a prosecuting attorney or a court makes an examination of a defendant for the purpose of determining his physi-

cal condition is competent to testify regarding the information he gained if he does not assume to act as the physician for the defendant or proffer to the latter his professional aid.''

In *City and County of San Francisco* v. *Superior Court*, 231 P. 2d 26 (Cal.), Justice Traynor, speaking for the court, stated:

''The confidence that is protected is only that which is given to a professional physician during a consultation with a view to curative treatment; for it is that relation only which the law desires to facilitate.''[1]

Likewise, in *State* v. *Fackrell*, 271 P. 2d 679 (Wash.), quoting from *State* v. *Winnett*, 92 P. 904, it said:

''There is nothing here tending to show that the relation of physician and patient existed between them, or that any confidential relation whatever existed. The record does not indicate, but presumably, the examination was made at the instance of the state, and was made for the purpose of publishing the result of the examination. No confidential relation appears to be violated. The case does not come within the spirit or reason of the law which prohibits physicians from giving information acquired in attending a patient, and no error was committed in admitting the testimony objected to.''

It is urged that the court erred in failing to quash the warrant of arrest, since the appellant was arrested without a warrant. This did not constitute error. Our statute (Ark. Stat. Ann. 43-403) permits a peace officer to make an arrest where he has reasonable grounds for believing that the person arrested has committed a felony. We think the evidence obtained by Sheriff Brinkman in his investigation on the night of June 8 clearly indicated that the prosecuting witness had been raped,

---

[1] Our statute, Ark. Stat. Ann. § 28-607 (Repl. 1962) also provides that a doctor or nurse shall not be compelled to disclose any information "which he may have acquired from his patient while attending in a professional character, and which information was necessary to enable him to precribe as a physician or do any act for him as a surgeon or trained nurse."

and that the officer had reasonable grounds for believing that appellant had committed the offense.

We are of the view that prejudicial error was committed by the court in permitting two young women to testify for the state on rebuttal. The circumstances were as follows: In an effort to establish his good character, appellant offered the testimony of Carol Jan Gray, Ann Page (both by deposition), and Mollie Mayhan. Miss Gray testified that she had been alone with appellant at times, and that he had never made any improper advances toward her. Miss Page testified that she took guitar lessons from Henson, and that he had never made any improper advances. Miss Mayhan stated that she had worked as a babysitter for Henson and his wife for about two and a half months, and that appellant had never made any advances toward her. Over objection, the court then permitted the state to offer in rebuttal (to the evidence of Misses Gray, Page and Mayhan) the testimony of the two young women mentioned in the opening sentence of this paragraph. One testified that Henson, whom she had just met, had asked her to go to Little Rock with him for the purpose of making a record; that appellant raped her twice on this tirp, but that it was never reported to the authorities because she did not want to "get in a scandal."

The other young woman testified that appellant also raped her in an automobile after placing a knife to her throat. All of this testimony—both on the part of the defense and the state—was inadmissible. In 20 Am. Jur., under "Evidence," § 326, pp. 305 and 306, it is pointed out that the generally prevailing rule is that testimony to prove the good or bad character of a defendent in a criminal prosecution

"must relate and be confined to the general reputation which such person sustains in the community or neighborhood in which he lives or has lived. Thus, evidence on behalf of the state in a criminal prosecution attacking the character of the accused for the purpose of impugning him as a defendant, where he puts his good character

in issue by introducing evidence to sustain the same, must be confined to his general reputation for the particular traits involved in the offense charged. Evidence of specific acts or of conduct of a person upon particular occasions, bearing upon his character, is usually held to be inadmissible. The admission of such evidence would raise collateral issues and divert the minds of the jurors from the matter at hand. It is manifestly unfair to compel a party to defend specific acts alleged as proof of bad reputation or character, although he must be prepared to defend his general reputation. This rule is applicable to evidence in rebuttal as well as to original testimony. Thus, the state in rebutting the evidence of the defendant's good character is confined to evidence showing his general reputation as to having a bad character, and not to specific acts derogatory to his good character.''

Our rule in Arkansas is in accord. In *Shuffield* v. *State,* 120 Ark. 458, 179 S.W. 650, this court stated that ''it is well-settled that neither good nor bad character can be proffered by specific acts or deeds.'' The state defends the introduction of this evidence on the basis of the fact that appellant had first offered specific instances of good behavior, thus opening the door for the prosecution to offer specific instances of bad behavior as a matter of counteracting appellant's testimony. However, two wrongs do not make a right. The evidence offered by appellant was clearly inadmissible, but this did not justify the state in offering inadmissible evidence. In *United States* v. *Beno,* 324 F. 2d, 582 (1963), after the government had concluded its case in chief, the court permitted the defense to offer testimony relating to the question of the defendant's character. Thereupon, three witnesses testified of specific instances, where Beno acted honorably, but it was clear that none of the witnesses were competent to testify as to the defendant's community reputation for honesty, veracity, or any other trait commonly classified as relevant to character. Thereafter, the government proceeded to offer evidence of specific instances of conduct on the part of the defend-

ant, which amounted to criminal violations. In reversing the conviction, the court said:

"We are left to determine whether the defendant, by calling witnesses Candee, McCracken and Nagle to testify as to specific occasions on which Beno acted honorably, thereby 'opened the door' to all of the testimony offered, both on cross-examination and through the prosecution's rebuttal witnesses, as to the specific instance on which his conduct was improper in one fashion or another. In determining this issue, we must first distinguish two different situations from the present case. It is true, as the government has noted that where a defendant, in his direct testimony, falsely states a specific fact, the prosecution will not be prevented from proving, either through cross-examination or by calling its own witnesses, that he lied *as to that fact*. (Citing cases) The rationale behind this rule is not difficult to perceive, for even if the issue injected is irrelevant or collateral, a defendant should not be allowed to profit by a gratuitously offered mistatement.

"Further, where a defendant has offered *proper* character testimony through witnesses who testify to his good reputation in the community, it is permissible to ask these witnesses whether they have 'heard' of rumors which could injuriously affect their evaluation, provided that the prosecution acts in the good faith belief that the incidents to which the questions allude actually occurred, and the jury is instructed as to the limited weight which such 'evidence' may be given. (Citing cases) The often-stated purpose for permitting such questions, even when they refer to a defendant's prior arrests, is that they better enable the jury to evaluate the character testimony which has been proffered. If a witness has heard of these damaging 'rumors' and adheres to his statement that the defendant's reputation is good, some light will have been shed upon the standards which he has employed; alternatively, if he has not heard of these 'rumors,' some doubt will have been cast upon his ability to speak on behalf of the community.

"But neither of these rules suggests that once a defendant has offered irrelevant and incompetent evidence on certain specific facts, the prosecution is immediately entitled to explore without restraint and at great length *any* specific occurrence which might tend to create an abhorrent image of the defendant. (Citing cases) *For it makes little sense to insist that once incompetent evidence is erroneously admitted, the error must of necessity be compounded by 'opening the door' so wide that rebutting collateral, inflammatory and highly prejudicial evidence may enter the minds of the jurors.*[2] In short, a small advantage improperly obtained does not compel the exaction of a gross disadvantage in penalty, particularly where a tarnished verdict is the inevitable result.

"As we have already indicated, a criminal defendant is entitled to have his guilt or innocence determined on the specific offense charged and not risk the possibility of conviction for a series of prior specific acts collectively suggested that his career had been reprehensible. The force of this principle, which lies at the heart of our criminal law system and seems a vital part of our definition of due process of law, is in no way blunted merely because a defendant has, in seeking acquittal, introduced evidence of less than questionable relevance.

\* \* \*

"\* \* \* To put it succinctly, once a man \* \* \* has been shown to be fundamentally immoral, a jury will hardly be influenced by the fact that there were days when he did not do anything dishonest."

Here, too, the testimony of the two young women that Henson had raped them, was bound to have its effect upon the minds of the jurors, and, if believed, certainly established appellant as being fundamentally immoral. We feel, unquestionably, that this evidence was prejudicial, and requires a reversal of the judgment.

Several alleged errors need not be discussed, since the questioned instances will not arise on a retrial. For

---

[2] Emphasis supplied.

example, appellant strongly urges that the court erred in refusing to grant a continuance to enable him to obtain the deposition of Clyde Bias, who, according to appellant, would have testified that he had talked to the prosecuting witness on the date of the alleged rape, less than one hour after it purportedly occurred; that this witness would have stated that the young woman had not complained of any rape or mistreatment by Henson; further, that her clothing and personal appearance did not indicate a struggle. Appellant's counsel had attempted to subpoena this witness, but the sheriff was unable to locate Bias. As stated, since the case is being reversed, a detailed discussion of this point is not necessary, but it does appear that, in the interest of justice, appellant should have been granted a reasonable continuance for the purpose of trying to locate the witness, particularly since the case was tried only three weeks after the alleged offense was committed.

It is also asserted that the court should have granted a continuance for the purpose of permitting appellant's counsel time for a proper investigation, but this, of course, is no longer important. Likewise, appellant complains of the manner in which the jury was selected, but this alleged error will likely not arise in another trial.

Appellant asserts that, the court erred in failing to give seven instructions that he offered, and also alleges that the court erred in giving one of its instructions. We have examined the proffered instructions, and find that they either do not correctly state the law, or were covered by other instructions given by the court. It was not error to tell the jury that the female's subsequent silence and conduct could be considered as bearing on the question of whether she consented to the act, unless the jury found that the prosecuting witness was in fear of her own safety when she failed to report the incident to strangers.

Other assignments of error have been examined, and found to be without merit.

Because of error committed by the trial court, as herein set out, the judgment is reversed, and the cause remanded.